948 F.2d 588
 Paris Hoyt CARRIGER, Petitioner-Appellant,
v.
Samuel A. LEWIS, Director of, DOC; Attorney General, State
of Arizona, Respondents-Appellees.
Paris Hoyt CARRIGER, Petitioner-Appellee,
v.
Samuel A. LEWIS, et al., Respondent-Appellant.
Paris Hoyt CARRIGER, Petitioner-Appellant,
v.
Samuel A. LEWIS, et al., Respondent-Appellee (Two Cases).
Paris Hoyt CARRIGER, Petitioner,
v.
Samuel A. LEWIS, et al., Respondent.
 Nos. 87-1549, 90-16013, 90-16016, 91-16334 and 91-70614.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submission Deferred Sept. 6, 1991.
Resubmitted Sept. 16, 1991.
Decided Nov. 4, 1991.
 
 Donald H. Bayles, Jr., Aspey, Watkins & Diesel, Flagstaff, Ariz., for the petitioner-appellant.
 Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, Ariz., for respondents-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before FARRIS, KOZINSKI and O'SCANNLAIN, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 Paris Hoyt Carriger is to receive the most severe punishment our society can impose. Having exhausted various avenues of relief in state court, he now seeks a federal writ of habeas corpus.
 
 Facts
 
 2
 On March 13, 1978, Robert Shaw's jewelry store was robbed. The robber bound Shaw's hands behind his back and crushed his skull with repeated blows from an iron skillet. Although severely wounded, Shaw survived this onslaught, only to be strangled to death with his own necktie. The perpetrator then departed with the fruits of the crime.
 
 
 3
 Two days later, Arizona charged Paris Hoyt Carriger with the robbery and the first-degree murder of Robert Shaw. After a two week trial, the jury convicted Carriger on both charges. The judge sentenced Carriger to 99-100 years' imprisonment for the robbery and to death for the murder.
 
 
 4
 Carriger dismissed his trial counsel, obtained new counsel and appealed his conviction and sentence. The Arizona Supreme Court affirmed. State v. Carriger, 123 Ariz. 335, 599 P.2d 788 (1979), cert. denied, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980) (Carriger I ). Carriger then filed a petition for post-conviction relief pursuant to Az.R.Crim.P. 32. The Maricopa County Superior Court denied relief, but the Arizona Supreme Court held that Carriger was entitled to a new sentencing hearing on the ground that Carriger's counsel had rendered inadequate assistance at sentencing. It also reversed as premature the superior court's dismissal of Carriger's other claims, holding that the court should "hear and consider such other matters properly raised in defendant's petition." State v. Carriger, 132 Ariz. 301, 306, 645 P.2d 816, 820 (1982) (Carriger II ).
 
 
 5
 On remand the superior court reimposed the original sentence. It also conducted a hearing on Carriger's other claims and denied all relief. Carriger then took his case to the Arizona Supreme Court for the third time. State v. Carriger, 143 Ariz. 142, 692 P.2d 991 (1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985) (Carriger III ). With one Justice dissenting, the court affirmed Carriger's conviction and sentence and dismissed his Rule 32 petition.
 
 
 6
 In 1985, Carriger filed a petition for a writ of habeas corpus in the United States District Court for the District of Arizona, raising eight separate claims. In late 1986, the district court granted Arizona's motion for summary judgment on all counts. A few months later, the court denied Carriger's motion to vacate its summary judgment order. Carriger timely appealed.
 
 
 7
 At Carriger's request, we stayed his appeal pending the resolution of his second Rule 32 petition in the Arizona state courts. The state superior court eventually dismissed Carriger's second petition, in which Carriger asserted that he had uncovered new exculpatory evidence, and the Arizona Supreme Court denied review. Carriger then asked us to remand to the district court so he could file a Rule 60(b) motion for relief from judgment on the ground of newly-discovered evidence. We denied Carriger's remand motion; consistent with our practice, we requested that Carriger first "show that the district court has indicated a willingness to consider the new evidence." Order of October 2, 1989, Carriger v. Lewis, No. 87-1549. Carriger was granted leave to renew his motion in the event the district court were to indicate its willingness.
 
 
 8
 Carriger then returned to the district court, but did not follow the procedure outlined in our order. Instead, he filed a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(2) and (6), which was denied on the merits on June 5, 1990. Both Carriger and Arizona appealed, Carriger because he was denied relief and Arizona because it believed Carriger's motion should have been dismissed as untimely. At about the same time, both parties filed motions for reconsideration. Before the district court could reconsider, we consolidated Carriger's and Arizona's appeals from the June 5 order with Carriger's earlier appeal from the grant of summary judgment. On July 25, 1991, the district court entered a new order, this time denying Carriger's Rule 60(b) motion as both untimely and without merit. Carriger appealed this new order and asked that it be consolidated with the other appeals. He also filed a second petition for a writ of habeas corpus directly with us, raising claims which, he notes, "are all included in the pending appeals."
 
 Standard of Review
 
 9
 We review the district court's grant of summary judgment denying a petition for a writ of habeas corpus de novo. Richmond v. Lewis, 948 F.2d 1473, 1479 (9th Cir.1991). We also review the district court's assertion of jurisdiction over a Rule 60(b) motion de novo. United States v. Kersting, 891 F.2d 1407, 1410 (9th Cir.1989).
 
 Jurisdiction
 
 10
 The district court had jurisdiction over Carriger's first habeas petition and Carriger timely appealed the court's summary judgment order and its refusal to vacate the summary judgment order. We therefore have jurisdiction over the claims raised in that appeal (No. 87-1549). Once Carriger filed the notice of appeal, however, the district court lost jurisdiction over Carriger's habeas petition. Smith v. Lujan, 588 F.2d 1304, 1307 (9th Cir.1979). We informed Carriger of this jurisdictional hurdle and explained the procedure he was required to follow to revest the district court with jurisdiction. Because Carriger did not follow that procedure, the district court lacked jurisdiction to consider Carriger's subsequent Rule 60(b) motions. The district court's June 5, 1990, and July 25, 1991, orders are therefore vacated (Nos. 90-16013, 90-16016, 91-16334).
 
 
 11
 The remaining action is Carriger's second petition for a writ of habeas corpus (No. 91-70614). The petition was addressed directly to this panel. However, a habeas petition may not be made to a panel of circuit judges, but must be made to a specific circuit judge. 28 U.S.C. § 2254(a).[1] Because we do not have jurisdiction to consider Carriger's second habeas petition, we dismiss it without prejudice.[2]
 
 Discussion
 
 12
 Only Carriger's first appeal is before us. In that appeal, Carriger asserts eight defects in the trial and sentencing hearing that led to his death sentence. We address each in turn.[3]
 
 
 13
 * A. Carriger first argues that he was denied the right to compulsory process because his attorney was limited in his examination of the prosecution's key witness, Robert Dunbar. Dunbar, the only person who could identify Carriger as the man who robbed and murdered Robert Shaw, was called to testify by the prosecution. Dunbar admitted during direct examination that he made fabrications relating to this case and that he had six prior felony convictions. He also explained that he was motivated to testify against Carriger because he had been granted immunity in exchange for his testimony. During cross-examination, Carriger's counsel questioned Dunbar extensively about various subjects in an attempt to impeach Dunbar and to prove that Dunbar, not Carriger, robbed and killed Shaw. This cross-examination was not limited in any way.
 
 
 14
 After the prosecution rested, Carriger's counsel called Dunbar to testify again. Counsel was allowed to question Dunbar on several points but, shortly into the examination, the prosecutor objected to counsel's questioning as repetitive. At sidebar, defense counsel admitted that the questions he was now asking either were asked or could have been asked when he cross-examined Dunbar. The trial judge then ruled that counsel could not question Dunbar on matters that could have been raised during cross-examination. In light of that ruling, counsel represented he had no further questions for Dunbar.
 
 
 15
 A trial judge retains "wide latitude" to limit a defense counsel's questioning of a witness without infringing upon a defendant's Sixth Amendment rights. Michigan v. Lucas, --- U.S. ----, 111 S.Ct. 1743, 1746, 114 L.Ed.2d 205 (1991); Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). The trial judge's ruling here is consistent with the normal practice in both federal and state courts, which seeks to ensure the orderly presentation of facts and arguments at trial by assigning different functions to direct and cross examination. Direct examination, even of a previously called witness, is normally used to introduce evidence on new matters, whereas cross is normally used to probe for weaknesses in the witness's immediately preceding direct testimony. The trial judge's ruling reflected this practice; it could not have come as a surprise to Carriger's counsel. Because Carriger had a full and fair opportunity to question Dunbar, we cannot say that he was denied the right to compulsory process.
 
 
 16
 B. Carriger also claims that he was denied the effective assistance of counsel at trial. He points to a large number of alleged flaws in his counsel's performance both before and during trial. According to Carriger, his lawyer allegedly failed to: (1) conduct a proper pretrial investigation (including an investigation of Dunbar); (2) spend adequate time with Carriger preparing a defense; (3) obtain damaging Arizona Department of Corrections files on Dunbar; (4) make certain evidentiary objections; (5) submit voir dire questions; (6) offer jury instructions; (7) realize before trial that this was a death penalty case and proceed accordingly; (8) advise Carriger adequately of his right to testify; and (9) understand when felony convictions may be used for impeachment.
 
 
 17
 The Arizona Supreme Court held that all but one of these ineffective assistance claims were waived by Carriger as a result of his failure to raise them in his direct appeal. See Carriger III, 692 P.2d at 995-97. Carriger argues at length that the court did not so hold, pointing out that the Arizona Supreme Court proceeded to address the merits of these claims after ruling that Carriger had defaulted. However, a state supreme court's determination that a defendant has defaulted on a federal constitutional claim is not undermined by the fact that the court also chooses to reach the merits of the federal claim. See Coleman v. Thompson, --- U.S. ----, 111 S.Ct. 2546, 2556-57, 115 L.Ed.2d 640 (1991); Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989).
 
 
 18
 The Arizona Supreme Court clearly relied on Carriger's default as a ground for rejecting his ineffective assistance claims raised in Carriger III: "[W]e find Carriger's claims would be barred under state law...." 692 P.2d at 997; see also id. at 996 ("Because Carriger has not complied with Rule 32.2(c), he would not be entitled to obtain relief under state law...."). That this was an alternative holding does not change its preclusive effect. See Coleman, 111 S.Ct. at 2556-57; Thomas v. Lewis, 945 F.2d 1119, 1122-23 (9th Cir.1991). Because Carriger has not shown cause for this procedural default and actual prejudice stemming therefrom, he is barred from raising these ineffective assistance of counsel claims in his federal habeas petition. See Wainwright v. Sykes, 433 U.S. 72, 87-91, 97 S.Ct. 2497, 2506-09, 53 L.Ed.2d 594 (1977).
 
 
 19
 The only claim of ineffective assistance of trial counsel that the Arizona Supreme Court found Carriger had not waived was that counsel erred in failing to cross-examine Dunbar on his prior felony convictions. We agree with the Arizona Supreme Court that this failure did not "materially affect[ ] the deliberations of the jury," Cooper v. Fitzharris, 586 F.2d 1325, 1332 (9th Cir.1978), and therefore does not amount to ineffective assistance. Carriger I, 599 P.2d at 791. The jury was informed of Dunbar's convictions on direct examination and "[t]he only effect of counsel's omission was that the jury was not told of the convictions twice." Id.; see Woratzeck v. Ricketts, 820 F.2d 1450, 1456 (9th Cir.1987) (the defendant must first demonstrate that he was prejudiced by counsel's alleged error to prevail on an ineffective assistance claim), vacated on other grounds, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988).
 
 
 20
 At oral argument before us, Carriger claimed for the first time that he was also denied the effective assistance of counsel during the direct appeal from his conviction. To support this claim Carriger points to allegedly exculpatory evidence recently uncovered by his current attorney; he claims that his former trial and appellate counsel should have discovered this evidence in the exercise of ordinary diligence. This claim was not presented to the district court and, in any event, must be rejected because Carriger failed to exhaust his state remedies thereon. 28 U.S.C. § 2254(b) & (c). Carriger is free, after exhaustion, to raise this claim in a second habeas petition. Whether such a claim would be barred as an abuse of the writ pursuant to McCleskey v. Zant, --- U.S. ----, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), is not before us.
 
 
 21
 C. Carriger next argues that he was denied due process of law when the trial court instructed the jury on the elements of second-degree murder but provided the jury with a verdict form that did not list second-degree murder as an option. Carriger claims that to instruct the jury on second-degree murder but give it a verdict form that does not include second-degree murder as an option raises an unacceptable risk of jury confusion. Specifically, he argues that the jury could mistakenly believe, if it found him guilty only of second-degree murder, that it was required to convict him of the sole murder charge found on the verdict form--first-degree murder.[4]
 
 
 22
 This argument has little merit. The trial court explained the elements of second-degree murder only to focus the jury more clearly on the elements of first-degree murder. The instructions, read in their entirety, clearly state that the only crimes of which the jury could convict Carriger were robbery and first-degree murder, and that first-degree murder required a finding of premeditation or the predicates for felony murder. See Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (jury instructions must be viewed as a whole). Furthermore, there can be no argument that the factual predicates for first-degree murder were not found by the jury. The evidence at trial all pointed to the robber as the only person who could have killed Shaw, and as his having done so during the course of the robbery. As the jury found Carriger guilty of the robbery, it must have found the predicate for first-degree murder beyond a reasonable doubt. See Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246, 1263-66, 113 L.Ed.2d 302 (1991).[5]
 
 
 23
 D. Carriger attacks the constitutionality of the Arizona death penalty statute on two grounds: (1) that it deprives him of his Sixth Amendment right to a trial by jury on the functional offense of capital murder because the court determines whether or not to impose the death penalty; (2) that it does not require the state to prove both the appropriateness of a death sentence and the absence of sufficiently substantial mitigating circumstances beyond a reasonable doubt. As Carriger recognizes, both of these claims have been resolved against him by Richmond v. Lewis, 948 F.2d 1473, 1481-82 (9th Cir.1991). See also Walton v. Arizona, --- U.S. ----, 110 S.Ct. 3047, 3054-56, 111 L.Ed.2d 511 (1990).
 
 
 24
 E. Carriger claims he was subject to double jeopardy at his second sentencing hearing when the trial judge found an aggravating circumstance that was found to be nonexistent at his first sentencing hearing. The Supreme Court rejected this argument in Poland v. Arizona, 476 U.S. 147, 152-57, 106 S.Ct. 1749, 1753-56, 90 L.Ed.2d 123 (1986).
 
 
 25
 F. Carriger's remaining attack on the Arizona death penalty scheme is that it is infected by an unconstitutional racial bias. In support, he presents statistical evidence showing that a person convicted in Arizona of first-degree murder is much more likely to suffer the death penalty if his victim was white than any other racial group. We held in Richmond that such general statistical data is insufficient to establish an equal protection violation. 948 F.2d at 1491. Carriger "must prove that the decisionmakers in his case acted with discriminatory purpose." McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis in original). This he has failed to do.
 
 II
 
 26
 Having resolved those of Carriger's arguments that do not raise substantial questions, we turn to what we consider the most difficult issue in this appeal: Carriger's argument that under Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382 (1980), he was entitled to both an instruction and verdict form containing the lesser included offense of second-degree murder. The Arizona Supreme Court rejected this argument on the merits. Carriger III, 692 P.2d at 996-97. Carriger is thus deemed to have exhausted his state remedies and is entitled to raise this issue on federal habeas. However, he now faces another significant hurdle because Beck was decided almost five months after Carriger's direct appeal became final.[6] Under Teague v. Lane, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), and Penry v. Lynaugh, 492 U.S. 302, 313-14, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989) (applying Teague to capital sentencing), Carriger is not entitled to the benefit of the Beck rule if Beck announced a new rule of constitutional law, unless that new rule falls within one of the two narrow exceptions listed in Teague.
 
 
 27
 A. The threshold question is whether Teague and Penry apply. Normally the answer is clear once it is established (as it is here) that a petitioner's direct appeal became final before the constitutional rule was announced. Carriger asserts, however, that he is entitled to the benefit of Beck on federal habeas because the Arizona Supreme Court applied Beck retroactively in a state post-conviction proceeding. Carriger III, 692 P.2d at 996-97. According to Carriger, if Arizona applied Beck retroactively on collateral review, we are bound to give Beck retroactive effect as well.
 
 
 28
 Structural procedural questions such as exhaustion and retroactivity are matters of federal, not state, law. See Jennison v. Goldsmith, 940 F.2d 1308, 1310-11 & n. 4 (9th Cir.1991); Batchelor v. Cupp, 693 F.2d 859, 862-63 (9th Cir.1982), cert. denied, 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983). The retroactivity rule adopted in Teague reflects not only a healthy measure of respect for state court decisions that complied with contemporaneous constitutional norms, but it also serves a policy of treating all similarly situated defendants equally on federal habeas. Teague, 489 U.S. at 316, 109 S.Ct. at 1078 ("implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review" (emphasis original)).
 
 
 29
 Neither of these policies is directly implicated by the fact that a state court may choose to give a new constitutional rule broader retroactive effect than do the federal courts under Teague.[7] Indeed, broadening the scope of federal habeas as a consequence of a state court's decision to do so during state post-conviction proceedings might well discourage state courts from adopting retroactivity rules that are more generous than that of Teague--to the ultimate detriment of criminal defendants.
 
 
 30
 We find nothing in the language or logic of Teague or its progeny that would allow the exception Carriger seeks. We therefore turn to whether Beck may be applied retroactively as a matter of federal law under Teague.
 
 
 31
 B. Beck involved an Alabama death penalty statute which prohibited the trial judge from giving the jury the option of convicting the defendant on a lesser included offense. This unusual statute was directly contrary to the procedure uniformly adopted in other states and in federal court, pursuant to which the defendant was entitled to an instruction and verdict form on a lesser included offense if the evidence supported it. 447 U.S. at 635-36 & n. 12, 100 S.Ct. 2389 & n. 12. Even in Alabama, a defendant in a noncapital case was entitled to the benefit of the uniform rule. Id. at 636-37, 100 S.Ct. at 2389.
 
 
 32
 The language the Court used in Beck certainly indicates that it was announcing a new constitutional rule of criminal procedure.[8] The Court stated that "we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." 447 U.S. at 637, 100 S.Ct. at 2389. Indeed, the Court had expressly left this question open in an earlier case. See Keeble v. United States, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 1997-98, 36 L.Ed.2d 844 (1973), quoted in Beck, 447 U.S. at 634-35, 100 S.Ct. at 2388. The Beck Court also never claimed that its conclusion was compelled by precedent; instead, it reasoned that "the nearly universal acceptance of the rule in both state and federal courts [as a matter of statutory or common law] establishes the value to the defendant of this procedural safeguard." 447 U.S. at 637, 100 S.Ct. at 2389.
 
 
 33
 At the same time, the rule announced by Beck was anything but new, as it elevated a near-universal procedural safeguard to the constitutional level. It is probable that the Beck constitutional rule was new only because no state had previously deviated from the established practice. One could argue, therefore, that the rule in Beck had been part and parcel of due process all along, but the rule had not been announced earlier because no state had thought to do otherwise before.
 
 
 34
 While the matter is not entirely free from doubt, we hold that a constitutional rule is newly created--and thus a new rule for the purpose of retroactivity under Teague v. Lane--at the time the Supreme Court first elevates it to constitutional status, even if the rule is not otherwise new. Sawyer v. Smith, 110 S.Ct. 2822, provides significant guidance on this point. At issue in Sawyer was the retroactive effect on federal habeas of the constitutional rule announced in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (holding unconstitutional a prosecutor's comments designed to diminish the jury's sense of responsibility in the capital sentencing decision). In concluding that Caldwell had announced a new rule under Teague, the Sawyer Court rejected the argument that the rule was not new because it had been in force in many states prior to Caldwell. Sawyer, 110 S.Ct. at 2829-30. It recognized, moreover, that in adopting the constitutional rule, the Caldwell Court relied "in part on the adoption by many state courts of rules that prohibited prosecutorial comments that could diminish the jury's sense of sentencing responsibility." Id. at 2830. Nevertheless, Sawyer held that Caldwell adopted a new constitutional rule because the rule was not "dictated by precedent existing at the time the defendant's conviction became final." Id. at 2827 (quoting Teague, 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original)).[9] Our situation is analogous to that in Sawyer, and we therefore conclude that Beck established a new rule for the purpose of Teague.
 
 
 35
 C. Our Teague analysis is not yet complete. A new rule may be applied retroactively on federal habeas if it either (1) puts " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe' " or (2) amounts to a "watershed rule[ ] of criminal procedure" which " 'alter[s] our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction.' " Teague, 489 U.S. at 311, 109 S.Ct. at 1075 (quoting Mackey, 401 U.S. at 692, 693-94, 91 S.Ct. at 1180, 1180-81 (Harlan, J., concurring and dissenting) (emphasis in original)).
 
 
 36
 The first Teague exception is inapplicable because Beck does not purport to prohibit the state from proscribing any type of conduct.[10] The Beck rule also does not fall within the second Teague exception. On this point, Sawyer again provides significant guidance. Rejecting Sawyer's argument "that the second Teague exception should be read to include new rules of capital sentencing that 'preserve the accuracy and fairness of capital sentencing judgments,' " 110 S.Ct. at 2831, the Court noted that "[a]ll of our Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense." Id. at 2832. However, the Court held, "[a] rule that qualifies under [the second Teague ] exception must not only improve accuracy, but also 'alter our understanding of the bedrock procedural elements' essential to the fairness of the proceeding." Id. at 2831 (quoting Teague, 489 U.S. at 311, 109 S.Ct. at 1075 (emphasis in original)). Applying this principle to the case before it, the Court concluded that:
 
 
 37
 [t]he Caldwell rule was designed as an enhancement of the accuracy of capital sentencing, a protection of systemic value for state and federal courts charged with reviewing capital proceedings. But given that it was added to an existing guarantee of due process protection against fundamental unfairness, we cannot say this systemic rule enhancing reliability is an 'absolute prerequisite to fundamental fairness' of the type that may come within Teague's second exception.
 
 
 38
 Id. at 2832 (quoting Teague, 489 U.S. at 314, 109 S.Ct. at 1077).
 
 
 39
 Our case is again closely analogous to Sawyer. The substantive rule at issue--that adopted in Beck--is designed to prevent a jury from returning a capital murder conviction when it is unconvinced that the defendant is guilty of capital murder but is convinced he is guilty of something. See Spaziano v. Florida, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984). If the jury is denied the option of convicting for noncapital murder--or some other very serious lesser included offense--it may decide to convict the defendant of capital murder rather than letting him walk.
 
 
 40
 So understood, Beck did not establish an independent constitutional right, only a safeguard against the risk that the jurors will abandon their oath and convict even when the evidence does not support conviction. The Beck rule cannot fairly be described as a "bedrock procedural element" for the conduct of criminal trials; it is more akin to a prophylactic rule intended to buttress the fundamental right not to be convicted except based upon proof beyond a reasonable doubt. Thus, like the Caldwell rule, it provides a systemic enhancement of the reliability of capital sentencing, but it is not "an 'absolute prerequisite to fundamental fairness' of the type that may come within Teague's second exception." Sawyer, 110 S.Ct. at 2832 (quoting Teague, 489 U.S. at 314, 109 S.Ct. at 1077). Accordingly, we hold that Beck created a new rule that may not be applied on federal habeas and do not reach the merits of Carriger's Beck argument.[11]
 
 III
 
 41
 Because this panel retains jurisdiction over this matter until its final disposition, see 9th Cir.Rule 22-2, and because it is not unlikely that there will be further appeals, we take this opportunity to provide guidelines for the conduct of further proceedings. Within 14 days after filing a notice of appeal, the appellant shall file a memorandum, not exceeding five pages, setting forth the issue or issues presented, whether any of the issues were previously briefed or argued, whether further briefing or argument is necessary, and a suggested briefing schedule. The appellee shall respond within 14 days in a memorandum addressing the same subjects and limited to the same maximum length. Upon filing these memoranda, the parties are relieved of all filing requirements under the Federal Rules of Appellate Procedure and the Ninth Circuit Rules. After reviewing the parties' memoranda, we shall issue an order governing the conduct of further proceedings.
 
 Conclusion
 
 42
 The district court's orders granting summary judgment and refusing to vacate the same are affirmed. The district court's Rule 60(b) orders of June 5, 1990, and July 25, 1991, are vacated for want of jurisdiction. Carriger's second habeas petition is dismissed without prejudice. All other pending motions are denied.
 
 
 
 [1]
 A petition for writ of habeas corpus may also be made to a district court, the Supreme Court or a specific Supreme Court Justice. Id
 
 
 [2]
 Carriger's second petition raised precisely the same claims as his first petition. It was filed as a procedural safeguard to allow us to consider all of the issues involved in his numerous appeals in the event any of those appeals were found not to be properly presented. It would serve no purpose to transfer this redundant petition to the district court
 
 
 [3]
 Unless otherwise noted in this section, each of Carriger's claims was thoroughly exhausted in state court and properly raised before the district court
 
 
 [4]
 Carriger did not object to any of the jury instructions at trial. However, the Arizona Supreme Court did not find that his jury confusion claim was procedurally barred and addressed it on the merits. Carriger III, 692 P.2d at 1006-07. Carriger has thus exhausted this claim in state court and may now raise it on federal habeas
 
 
 [5]
 We consider below the related, but distinct, argument that denying the jury the option of convicting Carriger for second-degree murder violated Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). See pages 595-98 infra
 
 
 [6]
 On January 21, 1980, the Supreme Court of the United States denied certiorari on Carriger's direct appeal. 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980). The Court decided Beck on June 20, 1980. 447 U.S. 625, 100 S.Ct. 2382 (1980)
 
 
 [7]
 As the Teague plurality noted, " '[t]he relevant frame of reference [for retroactivity analysis] ... is not the purpose of the new rule ..., but instead the purposes for which the writ of habeas corpus is made available.' " Teague, 489 U.S. at 306, 109 S.Ct. at 1072-73 (quoting Mackey v. United States, 401 U.S. 667, 682, 91 S.Ct. 1160, 1175, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring and dissenting)). The dominant purpose of the writ is "to ensure that state convictions comport with the federal law that was established at the time the petitioner's conviction became final," Sawyer v. Smith, --- U.S. ----, 110 S.Ct. 2822, 2830, 111 L.Ed.2d 193 (1990) (emphasis deleted), not with the federal law as it subsequently develops. Thus, our role on federal habeas is a limited one: to guarantee that a state conviction complied with federal law existing when a petitioner was convicted. That role cannot be expanded by the state courts
 
 
 [8]
 Carriger argues that we have already held that Beck did not create a new rule because we applied the Beck rule on collateral review in Vickers v. Ricketts, 798 F.2d 369 (9th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 980 (1987). However, in Vickers the Arizona Supreme Court had applied Beck on direct review. Id. at 373. Thus, Vickers was not a case where a rule was being applied for the first time after the defendant's direct appeal became final, so Teague would not have been implicated even if it had been announced before Vickers
 
 
 [9]
 The Supreme Court rarely adopts a constitutional rule that was theretofore totally unknown. To the contrary, the Court often looks to the practices of the various states to determine whether a rule has been so deeply ingrained in our legal culture that it has become constitutionally required. See, e.g., Ford v. Wainwright, 477 U.S. 399, 408-10, 106 S.Ct. 2595, 2601-02 (1986); United States v. Inadi, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125-26, 89 L.Ed.2d 390 (1986); Caldwell, 472 U.S. at 333-34 & n. 4, 105 S.Ct. at 2642 n. 4; Dutton v. Evans, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970); see also McGautha v. California, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971) (privilege against self-incrimination); In re Winship, 397 U.S. 358, 362-64, 90 S.Ct. 1068, 1071-73, 25 L.Ed.2d 368 (1970) (proof beyond a reasonable doubt). Were we to read Teague as applying only to those rules that are totally new, this would pretty much render Teague a nullity
 
 
 [10]
 At least in the capital sentencing contexts, the first Teague exception is also satisfied if the new rule "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense." Penry, 492 U.S. at 330, 109 S.Ct. at 1086. Beck, however, does not limit the class of defendants which the state may punish in a given manner, so the Penry modification to Teague does not apply
 
 
 [11]
 We note that, even were we to reach the merits, Carriger has not demonstrated a clear Beck violation. Carriger was charged with robbery, which is a very serious lesser included offense to felony murder. We do not decide whether the inclusion of the robbery charge on the verdict form would satisfy Beck