******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ROBINSON, J., joins, dissenting. In *Miller* v. *Alabama*,      U.S.     , 132 S. Ct. 2455, 2469, 183 L. Ed. 2d 407 (2012), the United States Supreme Court determined that the eighth amendment to the federal constitution forbids a state sentencing scheme for juvenile homicide offenders that mandates life imprisonment without the possibility of parole[1] but did not consider whether the rule applies retroactively to cases in which the defendant's sentence became final before *Miller* was decided. Since that time, however, numerous jurisdictions have addressed that question and have concluded unanimously that, to the extent *Miller* articulated a new rule of criminal procedure, it is not a watershed rule under *Teague* v. *Lane*, 489 U.S. 288, 311–13, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion), and does not apply retroactively to juvenile offenders in postconviction proceedings. The majority disagrees, thus making Connecticut the *only* jurisdiction in the nation to reach the contrary conclusion. Moreover, the majority provides no explanation as to why it believes that every other jurisdiction to have considered the question has reached the wrong result, even under a more liberal state retroactivity analysis than the analysis required under *Teague*. See part II of this opinion. The majority also concludes that the rule announced in *Miller* applies to the petitioner, Jason Casiano, because it deems his fifty year sentence the functional equivalent of life imprisonment without the possibility of parole. The majority arrives at this conclusion even though the sentences at issue in *Miller* required the juvenile offenders in that case to spend the remainder of their lives in prison, and despite the fact that the Connecticut legislature has determined that sixty years is the functional equivalent of life without the possibility of parole under this state's carefully crafted sentencing scheme. See General Statutes § 53a-35b. For the reasons that follow, I reject the majority's conclusions as legally unsupportable, and, accordingly, I respectfully dissent.

I

I first consider the sentencing issue because this court need not decide whether *Miller* applies retroactively unless it determines initially that the petitioner's sentence is the functional equivalent of life without the possibility of parole. On this issue, I agree with Justice Espinosa[2] that *Miller* applies to a sentencing scheme that mandates life in prison without the expectation of release, in part because that was the sentence imposed on the two juvenile offenders in *Miller*. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2460. The court in *Miller* also consistently described the issue as whether the eighth amendment proscribes a sentence that requires

a juvenile homicide offender to spend the remainder of his life in prison. See id., 2460, 2469. In addition, this court recognized in *State* v. *Riley*, 315 Conn. 637, 110 A.3d 1205 (2015), that "*Miller* is replete with references to . . . life without parole and like terms." Id., 653. Accordingly, the petitioner's fifty year sentence, on its face, is not within the purview of *Miller* because it is a term of years under which the petitioner will be released at the age of sixty-six, and, as a consequence, he is not expected to spend the remainder of his life in prison.

Insofar as the majority rejects this conclusion and determines that the petitioner's sentence is the functional equivalent of life without the possibility of parole, it acts in defiance of the legislature and this court's repeated recognition of the legislature's definition of "life imprisonment" in Connecticut's revised sentencing scheme. Under § 53a-35b, "life imprisonment," with two exceptions, is defined as a "definite sentence of sixty years . . . ."[3] The legislature enacted the provision in 1980[4] as part of its comprehensive revision of the state's criminal sentencing structure, which abolished indeterminate sentencing in favor of definite sentencing; *Mead* v. *Commissioner of Correction*, 282 Conn. 317, 325, 920 A.2d 301 (2007); in part to create more uniformity and consistency in the sentencing of similarly situated offenders. See, e.g., 23 H.R. Proc., Pt. 14, 1980 Sess., p. 4340, remarks of Representative Christopher Shays; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1980 Sess., pp. 1133–34, remarks of Edwin Sullivan on behalf of New Haven Mayor Biagio DiLieto. As this court explained in *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 16 A.3d 676 (2011), "[b]efore July 1, 1981, all felonies, with limited exceptions, were punishable by an indeterminate sentence of imprisonment. . . . Under this scheme, the trial court was authorized to set both the minimum and maximum portion of the sentence . . . [and] parole eligibility [was] established at the minimum less any good time used to reduce that minimum term. . . . The maximum term for a class A felony was life imprisonment, which meant the prisoner's natural life. . . . In 1980, as part of the legislature's comprehensive revision of the state's sentencing structure abolishing indeterminate sentencing and creating definite sentencing, the legislature enacted No. 80-442 of the 1980 Public Acts (P.A. 80-442), which became effective July 1, 1981 . . . . The legislature also enacted new legislation . . . that provided that . . . felonies committed on or after July 1, 1981, are punishable by a definite sentence. Under this scheme, sentencing courts were authorized to impose a flat or exact term of years of imprisonment without a minimum or maximum [term] . . . . For the crime of murder, the legislature provided that the sentence is a definite term of not less than twenty-five years nor more than life . . . . The legislature also enacted new legis-

lation . . . defining imprisonment for life as a definite sentence of sixty years." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 653–54. Accordingly, the definition of a life sentence in § 53a-35b was carefully chosen and has served as an integral part of Connecticut's criminal sentencing scheme for more than thirty years.

Since the revised sentencing scheme was enacted, this court has recognized repeatedly that life imprisonment, with two limited exceptions that do not apply in the present case,[5] means a term of sixty years. See, e.g., *State* v. *Adams*, 308 Conn. 263, 274, 63 A.3d 934 (2013); *Ostroski* v. *Commissioner of Correction*, 301 Conn. 360, 360–61, 21 A.3d 444 (2011); *Castonguay* v. *Commissioner of Correction*, supra, 300 Conn. 654; *State* v. *Collins*, 299 Conn. 567, 615, 10 A.3d 1005, cert. denied, U.S. , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011); *State* v. *Courchesne*, 296 Conn. 622, 746 n.84, 998 A.2d 1 (2010); *Mead* v. *Commissioner of Correction*, supra, 282 Conn. 325; *State* v. *Stenner*, 281 Conn. 742, 745 n.4, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007); *State* v. *Azukas*, 278 Conn. 267, 270 n.2, 897 A.2d 554 (2006); *State* v. *Ross*, 269 Conn. 213, 340 n.73, 849 A.2d 648 (2004); *State* v. *Roseboro*, 221 Conn. 430, 432 n.2, 604 A.2d 1286 (1992); *State* v. *Carpenter*, 220 Conn. 169, 171, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992); *State* v. *Tucker*, 219 Conn. 752, 759, 595 A.2d 832 (1991); *State* v. *Weinberg*, 215 Conn. 231, 233 n.2, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *State* v. *Arnold*, 201 Conn. 276, 277 n.1, 514 A.2d 330 (1986); *State* v. *Hill*, 196 Conn. 667, 668 n.2, 495 A.2d 699 (1985). Thus, even though sixty years does not constitute an actual life sentence under *Miller* for a convicted juvenile offender, Connecticut courts must, at the very least, comply with the legislative determination that sixty years is the functional equivalent of life in prison because this court always has followed the principle that "[w]e defer to the broad authority that legislatures possess in determining the types and limits of punishment for crimes. Indeed, [i]n examining the rationality of a legislative classification, we are *bound* to defer to the judgment of the legislature unless the classification is clearly irrational and unreasonable." (Emphasis added; internal quotation marks omitted.) *State* v. *Heinemann*, 282 Conn. 281, 311, 920 A.2d 278 (2007).

The majority casts aside this well established statutory authority and legal precedent, and, in effect, implicitly determines that § 53a-35b is unconstitutional as applied to juvenile offenders in Connecticut, declaring that, "although the legislature is free to create and define Connecticut's sentencing scheme . . . we are not constrained by the legislature's definition of life imprisonment as a sixty year term. We are charged with interpreting the eighth amendment to the federal

constitution in light of the . . . [c]ourt's decision in *Miller*. Whether *Miller* applies to sentences shorter than the legislatively defined 'life imprisonment' of sixty years is, therefore, a question for this court and not for the legislature." (Citation omitted.) Footnote 18 of the majority opinion. The majority thus rejects the notion that, "in order for a sentence to be deemed 'life imprisonment,' it must continue until the literal end of one's life." The majority instead concludes that "[t]he United States Supreme Court viewed the concept of 'life' in *Miller* and *Graham* [v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)] more broadly than biological survival" and that the court "implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to truly reenter society or have any meaningful life outside of prison." I disagree.

The majority's analysis is fatally flawed because it conflates the reasoning in *Graham* and *Miller*. Although *Graham* and *Miller* are both eighth amendment cases, they stand for different principles. The court in *Graham* held that the eighth amendment forbids a sentence of life imprisonment without the possibility of parole for juvenile nonhomicide offenders, in part because, given the lesser magnitude of nonhomicide crimes as compared with homicides, juveniles convicted of the former should be offered "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham* v. *Florida*, supra, 560 U.S. 75. The court explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. . . . There is a line between homicide and other serious violent offenses against the individual. . . . Serious nonhomicide crimes may be devastating in their harm . . . but in terms of moral depravity and of the injury to the person and to the public . . . they cannot be compared to murder in their severity and irrevocability." (Citations omitted; internal quotation marks omitted.) Id., 69. The court ultimately determined that a categorical rule barring a sentence of life imprisonment without parole was necessary to give "all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, [and] no hope." Id., 79.

In contrast, the court in *Miller* did not bar a sentence of life imprisonment without the possibility of parole for juvenile homicide offenders but held only that a *mandatory* sentence of life without parole is prohibited under the eighth amendment. *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. Accordingly, the court in *Miller* was not

concerned with the opportunity of convicted juvenile offenders to reenter society and conduct meaningful lives, as the majority maintains, because it did not deem a life sentence without parole for juvenile homicide offenders per se unconstitutional. Rather, the court focused on the sentencing process and the necessity for the sentencing court to consider a juvenile offender's youth *before* deciding whether to impose such a sentence. The court explained: "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult— these [mandatory] laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." Id., 2466. In sum, the court's concern in *Graham* that juvenile nonhomicide offenders be given the opportunity to obtain parole in order to rejoin society and lead a meaningful life was qualitatively different from its concern in *Miller* that a sentence of life imprisonment without parole be imposed on juvenile homicide offenders only after their youth and its attendant characteristics have been considered. Accordingly, it cannot be said that *Miller* "implicitly endorsed" the concept of life imprisonment as a lengthy term of years that would deprive the juvenile offender of having any meaningful life outside of prison. The opportunity for juvenile offenders to have a meaningful life was relevant only to *Graham*'s discussion of the opportunity for parole in cases involving juvenile offenders who have committed nonhomicide crimes.

I also disagree with the majority's conclusion that the petitioner in this case will have insufficient time to lead a meaningful life upon his release from prison. It is undisputed that juvenile homicide offenders subject to lengthy sentences will not have the same opportunities to establish a career, marry, raise a family, vote, or enjoy many other activities most law-abiding citizens take for granted or highly value. Homicide is the most serious crime, however, and society has determined that those who murder must be severely punished for this heinous offense. An offender nonetheless may create a meaningful life outside of prison at any age if sufficiently motivated, just as many law-abiding citizens who live their entire lives outside of prison never create what the majority might consider a meaningful life because they are not sufficiently motivated.[6] For all of the foregoing reasons, I reject the majority's conclusion that fifty years is the functional equivalent of a life sentence under *Miller* for juvenile homicide offenders in Connecticut.

## II

I next take issue with the majority's conclusion that *Miller* announced a watershed rule of criminal procedure that applies retroactively under the framework established in *Teague*. In *Teague*, a plurality of the court

identified "two exceptions to [the] general rule of non-retroactivity for cases on collateral review. First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. . . . Second, a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." (Internal quotation marks omitted.) *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 108 n.8, A.3d (2015). The court explained in *Teague* that the second exception is reserved for "watershed rules of criminal procedure"; *Teague* v. *Lane*, supra, 489 U.S. 311; that "implicate the fundamental fairness of the trial"; id., 312; and "without which the likelihood of an accurate conviction is seriously diminished." Id., 313. The court added in *Sawyer* v. *Smith*, 497 U.S. 227, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990), that it is "not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial. More is required. A rule that qualifies under this exception must not only improve accuracy, but also alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." (Emphasis in original; internal quotation marks omitted.) Id., 242; see also *Whorton* v. *Bockting*, 549 U.S. 406, 420–21, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007) (stating that second *Teague* exception "cannot be met simply by showing that a new procedural rule is based on a 'bedrock' right," but, rather, "[the] new rule must itself constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding" [emphasis omitted]).

In subsequent decisions, the United States Supreme Court further noted that the class of rules to which the second *Teague* exception applies is "extremely narrow"; *Schriro* v. *Summerlin*, 542 U.S. 348, 352, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004); and that it had "rejected every claim that a new rule has satisfied the requirements for watershed status." *Whorton* v. *Bockting*, supra, 549 U.S. 418; see, e.g., *Beard* v. *Banks*, 542 U.S. 406, 420, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004) (rejecting retroactivity of rule announced in *Mills* v. *Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 [1988]); *Schriro* v. *Summerlin*, supra, 358 (rejecting retroactivity of rule announced in *Ring* v. *Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 [2002]); *O'Dell* v. *Netherland*, 521 U.S. 151, 166–67, 117 S. Ct. 1969, 138 L. Ed. 2d 351 (1997) (rejecting retroactivity of rule announced in *Simmons* v. *South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 [1994]); *Gilmore* v. *Taylor*, 508 U.S. 333, 344–46, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993) (rejecting retroactivity of rule announced in *Falconer* v. *Lane*, 905 F.2d 1129 [7th Cir. 1990]); *Sawyer* v. *Smith*, supra, 497 U.S. 242–45 (rejecting retroactivity of rule announced in *Caldwell* v. *Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed.

2d 231 [1985]).

In light of this precedent, it is not surprising that all other federal and state jurisdictions that have considered the issue have concluded unanimously that the rule announced in *Miller* is not a watershed rule of criminal procedure that applies retroactively under the second *Teague* exception.[7] See, e.g., *Martin* v. *Symmes*, 782 F.3d 939, 943 (8th Cir. 2015); *Johnson* v. *Ponton*, 780 F.3d 219, 226 (4th Cir. 2015); *In re Morgan*, 713 F.3d 1365, 1367–68 (11th Cir. 2013); *Craig* v. *Cain*, United States Circuit Court of Appeals, Docket No. 12-30035 (5th Cir. January 4, 2013); *Malvo* v. *Mathena*, United States District Court, Docket No. 2:13-CV-375 (E.D. Va. June 20, 2014); *Ware* v. *King*, United States District Court, Docket No. 5:12-CV-147-DCB-MTP (S.D. Miss. September 5, 2013); *Ex parte Williams*, So. 3d , (Ala. 2015); *State* v. *Tate*, 130 So. 3d 829, 841 (La. 2013), cert. denied, U.S. , 134 S. Ct. 2663, 189 L. Ed. 2d 214 (2014); *People* v. *Carp*, 496 Mich. 440, 475 n.10, 852 N.W.2d 801 (2014); *Chambers* v. *State*, 831 N.W.2d 311, 331 (Minn. 2013); *Commonwealth* v. *Cunningham*, 622 Pa. 543, 558–59, 81 A.3d 1 (2013), cert. denied, U.S. , 134 S. Ct. 2724, 189 L. Ed. 2d 763 (2014).[8] At least one state court likewise has determined that *Miller* is not retroactive under a more liberal state retroactivity analysis than the analysis required under *Teague*. See *People* v. *Carp*, supra, 495–512 (*Miller* not entitled to retroactive application under Michigan's broader retroactivity standard).[9]

Courts have given many reasons why *Miller* is not a watershed rule, including that (1) the rule does not involve " 'sweeping' changes" like those in *Gideon* v. *Wainwright*, 372 U.S. 335, 343–44, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (holding that indigent defendants charged with felonies are constitutionally entitled to appointed counsel), the case against which all other watershed procedural rule arguments are generally compared; *Commonwealth* v. *Cunningham*, supra, 622 Pa. 559; see, e.g., *Craig* v. *Cain*, supra, United States Circuit Court of Appeals, Docket No. 12-30035; *Williams* v. *State*, supra, So. 3d ; *State* v. *Tate*, supra, 130 So. 3d 839–40; accord *People* v. *Carp*, supra, 496 Mich. 475 n.10; *Chambers* v. *State*, supra, 831 N.W.2d 330; (2) the rule deals only with sentencing and thus does not create an "impermissibly large risk of an inaccurate conviction" or "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding"; (internal quotation marks omitted) *State* v. *Tate*, supra, 839; accord *People* v. *Carp*, supra, 475 n.10; *Chambers* v. *State*, supra, 330; and (3) "the *Miller* [c]ourt's review of its precedents demonstrates that its holding was not a watershed development . . . [because] [t]he [c]ourt's cases have long established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence . . . ." (Internal quotation marks omitted.)

*Chambers* v. *State*, supra, 330; see also *Craig* v. *Cain*, supra.

The majority nonetheless concludes in a spare and thinly reasoned analysis that *Miller* is a watershed rule that applies retroactively under Connecticut law because it is "central to an accurate determination that the sentence imposed is a proportionate one" and because "our understanding of the bedrock procedural element of individualized sentencing was altered when the [United States Supreme] [C]ourt . . . require[d] consideration of new factors for a class of offenders . . . ."[10] The majority further concludes that the petitioner's sentence in this case "falls within the ambit" of the rule in *Miller* because it was imposed "without consideration of [*Miller*'s] mitigating factors . . . ." Text accompanying footnote 13 of the majority opinion. The majority's legal analysis, however, is unconvincing, and its factual conclusion that the trial court in the present case did not consider *Miller*'s mitigating factors when it sentenced the petitioner is unsupported by the record. Accordingly, I would join every other jurisdiction that has considered the issue and conclude that the rule announced in *Miller* is not a watershed rule that applies retroactively under *Teague*.

With respect to the element of accuracy, the court in *Sawyer* observed that, "because the second [*Teague*] exception is directed only at new rules *essential* to the accuracy and fairness of the criminal process, it is unlikely that many such components of basic due process have yet to emerge." (Emphasis added; internal quotation marks omitted.) *Sawyer* v. *Smith*, supra, 497 U.S. 243. "All of [the] [e]ighth [a]mendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense. Indeed, [the petitioner in *Sawyer*] has not suggested any [e]ighth [a]mendment rule that would not be sufficiently fundamental to qualify for the proposed definition of the exception, and at oral argument . . . counsel was unable to provide a single example." (Internal quotation marks omitted.) Id. The court in *Sawyer* thus concluded that the new procedural rule at issue in that case was not a watershed rule of criminal procedure but "an additional measure of protection against error . . . . The . . . rule was designed as an enhancement of the accuracy of capital sentencing, a protection of systemic value for state and federal courts charged with reviewing capital proceedings. But given that it was added to an existing guarantee of due process protection against fundamental unfairness, we cannot say this systemic rule enhancing reliability is an 'absolute prerequisite to fundamental fairness' . . . of the type that may come within *Teague*'s second exception." (Citations omitted.) Id., 244.

In Connecticut as well, the rule in *Miller* is not a rule "without which the likelihood of an accurate [sentence

for a juvenile offender] is seriously diminished," as required under *Teague*'s second exception. *Teague* v. *Lane*, supra, 489 U.S. 313. The rule merely *enhances* the accuracy of the sentence because substantial due process protections against fundamental unfairness already exist in Connecticut for juvenile and other offenders. See, e.g., General Statutes § 54-91b (defendant or defense counsel may request record of prior convictions and presentence investigation report before sentencing date); Practice Book § 43-5 (defense counsel shall be notified of, and permitted to attend, interview of defendant for preparation of presentence investigation report to assist defendant in answering inquiries and to protect defendant's rights); Practice Book § 43-10 (1) and (3) (during sentencing hearing, court shall afford defendant opportunity to speak on his own behalf, present mitigating evidence, and contest evidence on which court relied for sentencing); Practice Book § 43-14 (allowing defense counsel to raise with sentencing court inaccuracies in presentence investigation report). These protections have long allowed defendants to freely raise the issue of their juvenile status before and during the sentencing hearing. Moreover, courts always have been acutely aware of a juvenile offender's status, given the daily presence of most defendants at trial and the sentencing hearing.

I also disagree with the majority that the rule in *Miller* "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a [juvenile sentencing] proceeding" under Connecticut law. (Internal quotation marks omitted.) Rather, as previously suggested, the rule in *Miller* represents an incremental step in the continuing evolution of rules and procedures created to afford juvenile offenders in Connecticut adequate due process protections and to ensure that the sentencing process will not be fundamentally unfair.

One of the most important tools used by sentencing courts to provide these protections is the presentence investigation report (PSI). General Statutes § 54-91a (a) provides in relevant part: "No defendant convicted of a crime, other than a capital felony . . . or murder with special circumstances . . . the punishment for which may include imprisonment for more than one year, may be sentenced, or the defendant's case otherwise disposed of, until a written report of investigation by a probation officer has been presented to and considered by the court . . . ." Subsection (c) further provides in relevant part: "Whenever an investigation is required, the probation officer shall promptly inquire into the circumstances of the offense, the attitude of the complainant or victim, or of the immediate family where possible in cases of homicide, and *the criminal record, social history and present condition of the defendant.* Such investigation shall include an inquiry into any damages suffered by the victim, including medical expenses, loss of earnings and property loss. All

local and state police agencies shall furnish to the probation officer such criminal records as the probation officer may request. *When in the opinion of the court or the investigating authority it is desirable, such investigation shall include a physical and mental examination of the defendant. . . .*" (Emphasis added.) General Statutes § 54-91a (c); see also General Statutes § 54-91b.

The rules of practice implement the statutory mandate of a PSI for defendants convicted of a crime for which the punishment may include imprisonment for more than one year. See Practice Book §§ 43-3 and 43-4. The rules additionally provide that defense counsel shall be permitted to participate in the preparation of the PSI; Practice Book § 43-5; and that copies thereof "shall be provided . . . to the defendant or his or her counsel in sufficient time for them to prepare adequately for the sentencing hearing . . . ." Practice Book § 43-7. At the sentencing hearing, the court "shall afford the parties an opportunity to be heard and, in its discretion, to present evidence on any matter relevant to the disposition, and to explain or controvert the presentence investigation report . . . . When the judicial authority finds that any significant information contained in the presentence report . . . is inaccurate, it shall order the office of adult probation to amend all copies of any such report in its possession and in the clerk's file, and to provide both parties with an amendment containing the corrected information." Practice Book § 43-10 (1). The court also "shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of the sentence." Practice Book § 43-10 (3). Defense counsel is expected to be familiar with the contents of the PSI and any accompanying reports; Practice Book § 43-13; and "shall bring to the attention of the judicial authority any inaccuracy . . . of which he or she is aware or which the defendant claims to exist." Practice Book § 43-14.

The policies and procedures that the Court Support Services Division developed prior to the decision in *Miller* to guide the preparation of PSIs further required a "face sheet" containing basic demographic data describing the offender and the offense, information regarding the offender's version of the facts relating to the offense, the victim's attitude, the offender's personal history, the offender's criminal record, if any, and "[o]ther [i]nformation" deemed relevant.[11] Court Support Services Division, Policy and Procedures for Presentence Investigation (December 7, 2007) Policy No. 4.31, pp. 5, 10. With respect to the offender's personal history, the guidelines required "detailed information" concerning the offender's family background, relationships, children, employment, education or vocational training, financial status, housing, physical and mental health, substance abuse, and other relevant matters.

Id., p. 10. The guidelines also stipulated that the PSI must "emphasize the five years prior to the report's completion"; id.; which, in the case of juvenile offenders, meant their preadolescent and early adolescent years. The guidelines added that "[i]ssues that predate the five-year time frame will be presented if they represent significant experiences in the offender's life or are determined essential to establishing a pattern of behavior." Id. Accordingly, PSIs prepared prior to *Miller* provided sentencing courts in Connecticut with exactly the type of information that addressed *Miller*'s concerns regarding juvenile offenders.

We know this is true because the court in *Miller* clearly indicated, by example, the information it wanted judicial authorities to consider before sentencing juvenile offenders to life in prison without the possibility of parole. Although the court made the general observation that "children are constitutionally different from adults for purposes of sentencing" because of their (1) "lack of maturity and an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking," (2) vulnerability "to negative influences and outside pressures, including from their family and peers," and (3) "limited contro[l] over their own environment and lack [of] the ability to extricate themselves from horrific, crime-producing settings"; (internal quotation marks omitted) *Miller* v. *Alabama*, supra, 132 S. Ct. 2464; it also stated that sentencing authorities should seek evidence of these characteristics by considering the offender's role in the offense, family history, educational and behavioral background, and, when appropriate, past violations of the law. See id., 2467–68.

The court gave three specific examples of such evidence. The court first observed that, in *Eddings* v. *Oklahoma*, 455 U.S. 104, 105–106, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), it had invalidated the death sentence of a sixteen year old defendant who had shot a police officer at close range and killed him "because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance. [The court] found that evidence particularly relevant—more so than it would have been in the case of an adult offender. . . . [J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in assessing his culpability." (Citation omitted; internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2467.

The court next discussed the relevant characteristics of the two fourteen year old offenders whose sentences were at issue in *Miller*. With respect to the first offender, the court examined the circumstances of the crime and noted that he did not fire the bullet that killed the victim,

the state did not argue that he had intended to kill the victim, and his conviction was based on an aiding and abetting theory. Id., 2468. The court further noted that the offender first learned on the way to the scene of the crime that his friend was carrying a gun and that his age could have affected his calculation of the risk that his friend's behavior posed, as well as his unwillingness to walk away at that point, both of which related to his culpability for the offense. See id. The court added that the offender's family background and immersion in violence should have been considered, as well as the fact that his mother and grandmother previously had shot other persons. Id.

With respect to the second juvenile offender, the court observed that, although he had committed a vicious murder, he did so while under the influence of drugs and alcohol he had consumed with the adult victim. Id., 2469. In addition, "if ever a pathological background might have contributed to a [fourteen year old's] commission of a crime, it [was] here." Id. The court stated that the offender's "stepfather physically abused him; his alcoholic and drug-addicted mother neglected him; he had been in and out of foster care as a result; and he had tried to kill himself four times, the first when he should have been in kindergarten. . . . Nonetheless, [his] past criminal history was limited—two instances of truancy and one of second-degree criminal mischief. . . . That [he] deserved severe punishment for killing [the victim] is beyond question. But once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty." (Citations omitted; internal quotation marks omitted.) Id.

I emphasize that a comparison of the information discussed in *Miller* with the information required in Connecticut PSIs before *Miller* demonstrates that PSIs were required to address almost all of the factors the rule in *Miller* requires sentencing authorities to consider *because the past history and personal circumstances of a juvenile offender are necessarily descriptive of the offender's youth*. Nowhere is this better illustrated than in the present case. The petitioner's PSI, which the trial court reviewed and the prosecutor and defense counsel read and accepted without objection or exception prior to sentencing, contained nearly all of the information required under *Miller*. The nine page report began by describing the petitioner's pivotal role in committing the offense, which included his recruitment of a cousin and a friend to aid him and another cousin in the robbery of a Subway restaurant in the town of North Haven. The report also stated it was the petitioner, and not his cousins or friend, who vaulted over the counter, confronted the victim, shot the victim in the face when he refused to open a storage room door, and shot the victim two more times as he tried

to escape.

In a four page description of the petitioner's personal history, the report further explained that the petitioner, the youngest of three children, was raised in a stable home and that his parents, who had been married for more than twenty-five years at the time of the petitioner's crime, "appear[ed] to be hardworking, caring people who made every effort to provide a healthy environment for their children." The father related that, because he had met his wife in an orphanage in New York, "it was extremely important to him that they raise their own children and 'raise them right.'" The petitioner agreed that his father wanted the children "'to do better'" and stated that his parents were strict, especially his father. The petitioner denied that his father was abusive, although he indicated that his father had occasionally "'whipped'" him.

Both parents were employed, the father as a bus driver and truck driver, and the mother as a certified nurse's aide and rehabilitation technician. The petitioner's older brother was a respiratory therapist and the married father of two children, and his sister was a college student, the mother of two children, and employed as a physical therapy assistant. The petitioner had a three year old child and continued to maintain a relationship with the child's mother.

The petitioner's father stated that the petitioner had "posed steady discipline problems for as long as he [could] remember. . . . [I]n spite of their efforts to control his behavior . . . by the time the [petitioner] came to Connecticut [from Florida, where he had lived for the previous ten years], he was simply 'out of control.' He related that the [petitioner] fled Florida weeks before [committing the murder], after reportedly holding up a drug dealer which netted him and his cousin . . . [more than $8000]."

The petitioner's mother added that the petitioner "had difficulty in school and was always running away when he didn't like the rules at home, but that he [was] a 'good hearted kid,' especially kind to children and the elderly. The [petitioner's] mother . . . [had] difficulty grasping the notion that he took someone's life . . . ."

The petitioner's father described "an ongoing struggle to enlist the aid of Florida's [h]uman [r]esource and [c]riminal [j]ustice agencies in controlling the [petitioner's] behavior. He related that the [petitioner] refused to stay in school beginning in adolescence and at one point, he or [the petitioner's mother was] required to attend with him. They did so until the impracticality of the situation threatened their jobs. The [petitioner's] father stated that [the petitioner] refused to abide by a curfew and when they simply could no longer handle him, they appealed to the [Fort] Myers Police Department, hoping to incarcerate him for his own safety," but

the parents were told that the police could do nothing.

The petitioner's father also reported that, whenever the petitioner "was apprehended because of various criminal allegations, because of his age . . . '[the authorities] always let him go.' [The father] recalled one police officer telling him ' "[h]e is a rude, filthy-mouthed, nasty kid, who knows the system. He knows you have to come get him and we have to let him go." ' Indications are, however, that the [petitioner's] best behavior occurred in his parents' home. His father indicated that he never stole from there and was not violent or disrespectful. In response to their efforts at discipline, he ran away and did so frequently."

With respect to the petitioner's educational background, the report noted that, at the age of ten, while in the third grade, the petitioner "was referred for psychological testing after evidencing an array of behavioral problems in the classroom. These included [underachievement] in academics, poor group participation, defiance, fighting, severely poor concentration and a gross lack of effort." The petitioner, however, responded well to one-on-one intervention to address his study skills, behavior and various learning problems.

In middle school, the petitioner's academic performance declined even further. By seventh grade, he was failing in his classes, engaging in fights and vandalism, and attending school even less frequently. The school that he was attending decided, after retaining him for several years, that further retention was counterproductive, in part because of his physical size. The petitioner's return to school was conditioned on his completion of an adolescent treatment program for drugs and alcohol, but, after two months of sporadic cooperation and belligerency, he "ran away from the program." The petitioner subsequently attended, for a few months each, the Southwest Florida Marine Institute, where he did very well, Fort Myers High School, and a vocational technical high school, where he studied hotel management and achieved passing and sometimes higher grades.

The petitioner held several part-time jobs in Florida during his middle teenage years but admitted that he used alcohol and marijuana beginning at the age of fourteen and subsequently used cocaine. His case manager at the drug treatment program he briefly attended stated that, in her view, the petitioner's " 'biggest problem was giving into his friend[s] and giving into peer pressure.' " She also stated that the petitioner was "respectful, bright and motivated 'when he stayed off drugs' " and was " 'a loving father and devoted son.' "

After noting that the petitioner's "parents were unequivocally supportive and cooperative with efforts from 'helping agencies,' " the report summarized the authoring probation officer's findings as follows: "The

[petitioner's] difficulties in relating to others and functioning appropriately are recorded as early as the third grade. [F]earful for his future, the [petitioner's] parents maneuvered through a maze of social service and criminal justice agencies in an attempt to control him. Before he left Florida, just weeks before the [murder], his father admitted that in spite of their efforts, he was simply 'out of control.' His lifetime of rebellion and defiance then culminated in this hideous act, which took the life of a young man only doing his job as a counter clerk. [The petitioner] provided warning signs that he was capable of violence and had no regard for anyone, but himself. Unfortunately, the system was unable to put a stop to his behavior before this victim was viciously murdered." The report concludes with a copy of the petitioner's juvenile record, which shows prior arrests in Florida for petit theft, grand larceny, and burglary when the petitioner was fourteen years old, and assault and battery when the petitioner was sixteen years old.

During the sentencing hearing, the prosecutor made the petitioner's personal history a key element of his argument that the petitioner's sentence should be harsh. The prosecutor noted that the petitioner had been "born into a caring, stable family. His parents, his siblings have gone onto peaceful and successful lives. His parents tried to instill in him the best qualities that they apparently accomplished with their other children, and, yet, he apparently ignored them. Very often, the court has before it people with broken families, with violence in their background, family violence in their background, with lack of educational opportunity, with all kinds of marks that . . . their role in society has not been the best, that they're not offered the same benefits as some members of society. None of that is true of this person. And that makes it all the more appropriate that he be isolated from society for the longest amount of time that is appropriate given the circumstances. This was an execution. It appears to have been preplanned. One of the letters says that [the petitioner] brought along an audience for his preplanned execution, and I think that may be accurate. There is no doubt that this individual . . . has made, essentially, no contribution to society, that he is violent, that he is incorrigible, and that he should be incarcerated . . . ."

In light of this argument, defense counsel made only the following limited response: "[U]nfortunately, there's very little I can say under the circumstances except to empathize with the victim's family and to say that I, personally, deeply regret their loss. Other than that, I'd simply ask the court to impose the court's indicated sentence . . . ." The petitioner also made a few brief remarks, including an apology to the victim's family and expressions of gratitude to his own family for their support. The trial court ultimately imposed a total effective sentence of fifty years imprisonment, ten years less

than a life sentence under Connecticut law; see General Statutes § 53a-35b (defining "[a] sentence of life imprisonment" generally as "a definite sentence of sixty years"); and clearly less than a life sentence under *Miller*, which would have been imprisonment for the remainder of the petitioner's natural life. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2460.

In view of the requirement of a PSI and the preceding example of how a PSI is prepared and used by attorneys and the court during a sentencing hearing, it is simply not possible to conclude that the rule established in *Miller* "alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding" under Connecticut law. (Emphasis in original; internal quotation marks omitted.) *Sawyer* v. *Smith*, supra, 497 U.S. 242. Indeed, to the extent any further evidence is required to support this conclusion, it may be found in the procedural guidelines for PSIs that became effective on August 15, 2013, following the decision in *Miller*. See generally Court Support Services Division, Policy and Procedures for Presentence Investigation Report (August 15, 2013) Policy No. 4.31, pp. 1–22.[12]

Although the newly adopted guidelines are more detailed than the guidelines they replaced, most of the changes intended to address the concerns in *Miller* are refinements, rather than major revisions or additions, to the previous guidelines. For example, the post-*Miller* guidelines specify that the following information shall be provided for an offender under the age of eighteen: the age of the offender at the time of the offense; id., pp. 10–11; the level of the offender's participation in the offense; id.; the degree of familial influence or pressure on the offender; id., p. 14; the offender's intellectual capacity; id., p. 15; the community environment in which the offender is residing; id., p. 16; the ability of the offender to leave it; id.; and, finally, the offender's level of maturity, degree of impetuosity and ability to appreciate the risks and consequences of his or her own behavior.[13] Id., p. 17. The only new information required by the post-*Miller* guidelines relates to the offender's ability to navigate the criminal justice system and to participate meaningfully in defending against the charges, the offender's capacity for rehabilitation within and outside the prison environment, and scientific and psychological evidence showing differences in the brain development of a person under the age of eighteen and an adult. Id., pp. 17–18. This court recognized in *Riley*, however, that trial courts in Connecticut should consider evidence that *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham* v. *Florida*, supra, 560 U.S. 48, and *Miller* v. *Alabama*, supra, 132 S. Ct. 2455, credited as authoritative with respect to the last two factors *until the Court Support Services Division provides further guidance. State* v. *Riley*, supra, 315 Conn. 659.

Nevertheless, the majority concludes, in the absence of any evidence in the record, that PSIs prepared before the decision in *Miller*, including in the present case, were deficient because they did not examine "scientific and psychological evidence demonstrating the lesser culpability of juveniles and their greater capacity for reform." Footnote 13 of the majority opinion. The majority, however, fails to recognize that the petitioner's PSI referred to, and the court in the present case *considered*, evidence that *Miller* credited as authoritative with respect to those factors, despite the lack of guidance from the Court Support Services Division.

In *Roper*, *Graham* and *Miller*, the court observed that scientific evidence and sociological studies had identified three general differences between juvenile offenders and adults that sentencing courts should consider in determining a juvenile offender's culpability and potential for reform. *Miller* v. *Alabama*, supra, 132 S. Ct. 2464–65; *Graham* v. *Florida*, supra, 560 U.S. 68–69; *Roper* v. *Simmons*, supra, 543 U.S. 569–70. These are a juvenile's (1) propensity to act impetuously and irresponsibly, (2) susceptibility to negative influences and outside pressures, including peer pressure, and (3) unformed character and transitory personality traits. *Roper* v. *Simmons*, supra, 569–70. In *Miller*, the court elaborated that sentencing courts may consider these "hallmark features," identified by scientific and sociological studies, by taking into account the offender's family and home environment, the circumstances of the offense, including the extent of the offender's participation and the effect of familial or peer pressure on his or her conduct, and the possibility of rehabilitation when suggested by the circumstances. *Miller* v. *Alabama*, supra, 2468. It then considered these factors in the context of the two defendants in that case and concluded, with respect to the first defendant, that, "[a]t the least, a sentencer should look at such facts before depriving a [juvenile] of any prospect of release from prison"; id., 2469; and, with respect to the second defendant, that, "once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty." Id.

In the present case, all of the factors described in *Miller* were addressed in the petitioner's PSI, which provided a detailed description of the petitioner's central role in the crime, his "lifetime of rebellion and defiance," and multiple attempts by his family, the educational system and law enforcement to address and control his behavior. The PSI thus took into account the petitioner's culpability and potential for reform, and indicated that he was highly culpable, given the nature of his participation in the homicide, and that his potential for reform was low, given his consistent, out of control behavior beginning as early as the third grade

and continuing thereafter. We must *presume* that sentencing courts consider the information in the PSI because of the statutory mandate in § 54-91a (a) that "[n]o defendant convicted of a crime, other than a capital felony . . . or murder with special circumstances . . . the punishment for which may include imprisonment for more than one year, may be sentenced, or the defendant's case otherwise disposed of, *until a written report of investigation by a probation officer has been presented to and considered by the court . . . .*" (Emphasis added.) Indeed, if the majority deems this type of investigation and analysis insufficient under *Miller*, then the court's statement in *Riley* that sentencing authorities in Connecticut should consider evidence that *Roper*, *Graham* and *Miller* credited as authoritative with respect to the last two factors until the Court Support Services Division provides further guidance would be rendered meaningless. Additionally, any sentence of fifty years or more without the possibility of parole imposed on a juvenile offender will now be subject to review, regardless of the contents of the PSI and the sentencing court's on the record consideration of the offender's juvenile status.[14]

For the foregoing reasons, I respectfully dissent.

[1] Although the General Assembly refers to life imprisonment without the possibility of *release*; see, e.g., General Statutes § 53a-35b; we use the term life without the possibility of parole in accordance with the United States Supreme Court's use of that term in *Miller*. The terms are synonymous.

[2] Justice Espinosa also has issued a dissenting opinion in the present case.

[3] General Statutes § 53a-35b provides: "A sentence of life imprisonment means a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subparagraph (A) or (B) of subdivision (1) of section 53a-35a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

[4] See Public Acts 1980, No. 80-442, § 11.

[5] The two exceptions are life imprisonment for a capital felony committed prior to April 25, 2012, under the version of General Statutes § 53a-54b in effect prior to April 25, 2012, and life imprisonment for the class A felony of murder with special circumstances committed on or after April 25, 2012, under the version of § 53a-54b in effect on or after April 25, 2012, both of which involve life imprisonment without the possibility of release unless, in the case of a capital felony committed prior to April 25, 2012, a sentence of death is imposed. See General Statutes § 53a-35a (1).

[6] To the extent the majority relies on statistics from the Centers for Disease Control and Prevention to calculate the petitioner's life expectancy following his release from prison, I note that different agencies have reached different conclusions. Compare E. Arias, Centers for Disease Control and Prevention, National Vital Statistics Reports (January 6, 2014) p. 11 (calculating life expectancy of male at birth as seventy-six years), available at http://www.cdc.gov/nchs/data/nvsr/nvsr62/nvsr62_07.pdf (last visited May 19, 2015), with United States Social Security Administration, Retirement & Survivors Benefits: Life Expectancy Calculator, available at http://www.ssa.gov/cgi-bin/longevity.cgi (last visited May 19, 2015) (calculating life expectancy of male at birth as approximately eighty-three years). Life expectancy calculations also vary depending on the age that is used as the basis for the calculation. See E. Arias, supra, pp. 11–12 (calculating life expectancy of male at birth as seventy-six years, at age thirty-seven as seventy-eight years, and at age sixty-six as approximately eighty-four years); United States Social Security Administration, supra (calculating life expectancy of male at birth as approximately eighty-three years, at age thirty-six as approximately eighty-two years, and at age sixty-seven as approximately eighty-five years). Accordingly, the majority's conclusion that the defendant would have only a few more years to live following his release from prison at the age of sixty-six is highly speculative.

[7] An intermediate appellate court in Illinois appears to be the only court that has concluded that *Miller* constitutes a watershed rule under *Teague*'s second exception. See *People* v. *Williams*, 982 N.E.2d 181, 196–77 (Ill. App. 2012), appeal denied, 23 N.E.3d 1206 (Ill. 2015). The reasoning in *Williams*, however, was subsequently rejected by the Illinois Supreme Court in *People* v. *Davis*, 6 N.E.3d 709, 721–22 (Ill. 2014), which determined that *Miller* applies retroactively because it constitutes a new *substantive* rule.

[8] To the extent other courts have held that the rule in *Miller* applies retroactively, they have done so *only* on the ground that it is a new *substantive* rule under *Teague*'s first exception. See, e.g., *Hill* v. *Snyder*, United States District Court, Docket No. 10-14568 (E.D. Mich. January 30, 2013); *People* v. *Davis*, 6 N.E.3d 709, 722 (Ill. 2014); *State* v. *Ragland*, 836 N.W.2d 107, 117 (Iowa 2013); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 666, 1 N.E.3d 270 (2013); *Jones* v. *State*, 122 So. 3d 698, 703 (Miss. 2013); *State* v. *Mantich*, 287 Neb. 320, 342, 842 N.W.2d 716, cert. denied,     U.S.    , 135 S. Ct. 67, 190 L. Ed. 2d 229 (2014); *Petition of State of New Hampshire*, 166 N.H. 659, 670–71, 103 A.3d 227 (2014), petition for cert. filed sub nom. *New Hampshire* v. *Soto*, 83 U.S.L.W. 3558 (U.S. November 26, 2014) (No. 14-639); *Aiken* v. *Byars*, 410 S.C. 534, 540, 765 S.E.2d 572 (2014), petition for cert. filed, 83 U.S.L.W. 3703 (U.S. February 9, 2015) (No. 14-1021); *Ex parte Maxwell*, 424 S.W.3d 66, 75 (Tex. Crim. App. 2014); *State* v. *Mares*, 335 P.3d 487, 508 (Wyo. 2014). The Florida Supreme Court also recently held that *Miller* applied retroactively on substantive grounds under its own more liberal retroactivity test, which provides that a change in the law does not apply retroactively in Florida "unless the change: (a) emanates from [the Florida Supreme Court] or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." (Internal quotation marks omitted.) *Falcon* v. *State*, Florida Supreme Court, Docket No. SC13-865 (Fla. March 19, 2015). After concluding that the first two prongs of the test had been met, the court determined that the rule in *Miller* constituted a development of fundamental significance because it "announce[d] a new *substantive* bar to mandatory life sentences without the possibility of parole for all juveniles and proclaim[ed] that the [e]ighth [a]mendment forbids such mandatory sentencing schemes." (Emphasis added.) Id. The Florida Supreme Court thus concluded that the rule in *Miller* was retroactive under Florida's retroactivity standard for the same reason a new rule may be deemed retroactive under the first *Teague* exception.

[9] Although Michigan applies the test established in *Teague*, it also applies a state retroactivity analysis derived from the three step test set forth in *Linkletter* v. *Walker*, 381 U.S. 618, 629, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965); see *People* v. *Carp*, supra, 496 Mich. 497; which has since been replaced in most other jurisdictions by *Teague* because it has led to inconsistent results. See *Thiersaint* v. *Commissioner of Correction*, supra, 316 Conn. 123 n.19. Applying the state retroactivity analysis in Michigan, which requires consideration of (1) the purpose of the new rule, (2) the extent of reliance on the old rule, and (3) the effect of the retroactive application of the new rule on the administration of justice; *People* v. *Carp*, supra, 497; the Michigan Supreme Court explained that "*Teague* provides a floor for when a new rule of criminal procedure must be applied retroactively, with a state nonetheless free to adopt its own broader test for requiring the retroactive application of a new federal or state constitutional rule." Id., 496. The court then described Michigan's "predisposition against the retroactive application of new rules of criminal procedure" and stated that "only the extraordinary new rule of criminal procedure will be applied retroactively under Michigan's test when retroactivity is not already mandated under *Teague* . . . ." Id., 497. Relying on the foregoing three factors, the court ultimately concluded that the rule announced in *Miller* did not satisfy Michigan's retroactivity test. Id., 511–12.

[10] To emphasize why the rule announced in *Miller* should be given retroactive effect as a watershed rule of criminal procedure, the majority concludes its analysis with a passage from *Hill* v. *Snyder*, United States District Court, Docket No. 10-14568 (E.D. Mich. January 30, 2013): "[I]f ever there was a legal rule that should—as a matter of law and morality—be given retroactive effect, it is the rule announced in *Miller*. To hold otherwise would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice." (Internal quotation marks omitted.) Id. The court's pronouncement in *Hill*, however, has no relevance in the present case because, apparently, unbeknownst to the majority, the court characterized the rule in *Miller* as a *substantive* rule in the context

of a direct appeal in a civil action, and not as a watershed procedural rule in the context of collateral review in a criminal action. The court in *Hill* stated in a footnote, however, that it also "would find *Miller* retroactive on collateral review, because it is a new *substantive* rule, which 'generally applies retroactively.' " (Emphasis added.) Id. The majority thus leads the reader to believe, incorrectly, that the court in *Hill* agrees that *Miller* applies retroactively in collateral review cases because it is a watershed rule of criminal procedure.

[11] Following the decision in *Miller*, the Court Support Services Division updated its guidelines to require more specific information regarding juvenile offenders. See generally Court Support Services Division, Policy and Procedures for Presentence Investigation and Report (August 15, 2013) Policy No. 4.31, pp. 10–20.

[12] See footnote 11 of this opinion.

[13] These factors correspond to information required by the prior procedural guidelines that would have been contained in the PSI face sheet and the offender's personal history, including details regarding the offense, the offender's family background, relationships, children, education or vocational training, employment, financial status, housing, physical and mental health, and substance abuse, with emphasis on the five years preceding completion of the PSI, and any personal issues before that time that represent significant experiences in the offender's life or are deemed to be essential to establishing a pattern of behavior. Court Support Services Division, Policy and Procedures for Presentence Investigation (December 7, 2007) Policy No. 4.31, pp. 5, 10. For this reason, most of the factors in the post-*Miller* guidelines were discussed in the petitioner's PSI.

[14] The majority's assertion that PSIs prepared for juvenile offenders before *Miller* were deficient because the forms used did not include a field for the offender's age at the time of the offense is a classic example of elevating form over substance. As the majority itself concedes, the offender's age could be calculated quite easily from other information in the PSI, including the date of the offense and the offender's date of birth. I also categorically reject the majority's assertion that PSIs prepared before *Miller* were deficient because they did not require the probation officer to examine the *Miller* factors from the standpoint of the offender's juvenile status. All of the information in the PSIs of juvenile offenders before *Miller* was descriptive of the offender's juvenile character and history, and, therefore, such information could not be understood through any other lens but that of the offender's juvenile status.

Insofar as the majority suggests that the PSI in the petitioner's case was deficient because it was submitted to the court two months after he entered his conditional plea of nolo contendere and tentatively agreed to a fifty year sentence, and because the court did not refer to the petitioner's age in its on the record comments at the sentencing hearing, the majority overlooks the well established principle that, "once the trial court order[s] the presentence investigation, the trial court's acceptance of the . . . plea agreement necessarily [becomes] contingent upon the results of the [PSI]. Otherwise, the [PSI] would be little more than a nullity, and our law makes clear that [PSIs] are to play a significant role in [a court's determination of] a fair sentence. Simply put, any plea agreement must be contingent upon its acceptance by the court after [the court's] review of the [PSI]." (Internal quotation marks omitted.) *State* v. *Thomas*, 296 Conn. 375, 389, 995 A.2d 65 (2010). Accordingly, the majority's suggestion that the trial court imposed the petitioner's sentence without considering the PSI and the petitioner's juvenile status reflects a misunderstanding of the statutory directives; see General Statutes § 54-91a (a); and the practices that govern the decisions of sentencing courts.